**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANDREW CARMAN and KAREN CARMAN,** <br> **Plaintiffs** <br><br> **v.** <br><br> **JEREMY CARROLL,** <br> **Defendant** | : | **No. 3:10cv1013** <br> **(Judge Munley)** |

**MEMORANDUM**

Before the court are the parties' cross-motions for summary judgment. (Docs. 20, 24). Having been briefed, the motions are ripe for disposition.

**Background**

Plaintiffs Andrew and Karen Carman (hereafter "plaintiffs") resided at 101 Raspberry Path, Dingman's Ferry, Pennsylvania. (Doc. 21, Pls. Statem. of Mat. Facts (hereafter "Pls. Facts") ¶ 1). On July 3, 2009, plaintiffs were sitting in their kitchen with Jacqueline Vergottini, Karen Carman's sister. (Id. ¶ 4). Ms. Vergottini glanced out the window and noticed police officers near plaintiffs' shed.[1] (Id. ¶ 25). Mr. Carman also looked out the window and saw two officers, Pennsylvania State Troopers Defendant Jeremy Carroll and Brian Roberts. (Id. ¶ 26).

The troopers were dispatched to the Carman residence to look for an individual named Michael Zita, a felon parolee who had stolen a 2002 Chrysler Convertible and two loaded firearms. (Id. ¶¶ 10, 13; Doc. 25, Def. Statem. of Mat. Facts (hereafter "Def. Facts") ¶ 1). The police believed that Zita may have been on his way, to or was at, the Carman residence. (Def. Facts ¶ 2). The troopers did not have a search warrant for Carmans'

[1] Both parties refer to the structure in plaintiffs' back yard as either a shed or garage.

property or an arrest warrant for Zita. (Pls. Facts ¶ 22). Upon arriving at the Carman residence, the officers looked to see if the stolen vehicle was parked outside their home. (Def. Facts ¶¶ 1, 3). It was not. (Id.) The Carmans' home is located on a corner property with a road in front of and on the left side of their house. (Doc. 26, Ex. 4, Def. Carroll Tr. at 17). Defendant and Trooper Roberts parked their respective cars on the side of the property and proceeded to walked across plaintiffs' back yard where there was an open garage. (Def. Facts ¶¶ 3-4). Defendant described the garage as a structure open in the front, back and partially on the sides that had several cars in it. (Id. ¶ 4; Doc. 26, Def. Ex. 6). Without going inside, the Troopers looked into the garage, but did not see the stolen vehicle.[2] (Id. ¶ 4). They then proceeded up to the back deck attached to the Carman residence. (Id. ¶ 6). Mr. Carman walked onto the deck to see what the officers wanted. The parties largely dispute the events that occurred after Mr. Carman went outside.

Plaintiffs claim that Mr. Carman asked if he could help the officers. (Pls. Facts ¶ 28). The Troopers asked Mr. Carman, "Where is he?" referencing the whereabouts of Michael Zita. (Id. ¶ 29). After Mr. Carman learned who they were looking for, he explained that he went to school with Michael Zita twenty-five or thirty years ago. (Id. ¶ 32). Defendant asked him if he could take a look around and Mr. Carman refused. (Id. ¶ 33-34). After Mr. Carman told defendant that Michael Zita was not on the property, defendant told him to sit down. (Id. ¶ 40). Mr. Carman told the officers he did not have to sit down. (Id. ¶ 41). The officers threatened to arrest Mr. Carman. (Id. ¶ 42). Mr. Carman asked if they had a search warrant, which

[2] Based on the facts, it appears that the plaintiffs only noticed the officers after they looked into the garage.

they did not. (Id. ¶¶ 44-46). He told the officers that if they wanted to search his home they would need a search warrant. (Id. ¶ 46). Mr. Carman started to walk back to his home when Defendant Carroll pushed him up against the sliding glass door and tackled him down the stairs, off the deck. (Id. ¶¶ 49-50).

Mrs. Carman and Ms. Vergottini said that they saw Defendant Carroll slam Mr. Carman against the sliding glass door. (Id. ¶ 51). When they went outside Defendant Carroll was sitting on top of Mr. Carman and pushing his head into the ground. (Id. ¶¶ 53-54). The women yelled at defendant to get off Mr. Carman. (Id. ¶ 58). Mr. Carman yelled to call 911. (Id. ¶ 61). At some point, Ms. Vergottini did call 911. (Id. ¶ 62). The 911 operator informed her that police were already at the residence, however Ms. Vergottini explained that they were beating up her brother-in-law. (Id. ¶ 64). When Mr. Carman got up he had blood on his face and his shoulder was injured. (Id. ¶ 60).

Defendant provides a different account of what happened after Mr. Carman went outside onto the deck. Defendant explained that both he and Trooper Roberts went onto the back deck of the house and were going to knock on the back door. (Def. Facts ¶ 6). Mr. Carman exited the house and said "Who the fuck are you?" (Doc. 29, Def. Resp. to Pls. Statem. of Mat. Facts ¶ 28). Defendant explained who the troopers were and that they were looking for Michael Zita. (Id. ¶ 29). Mr. Carman refused to identify himself and was belligerent. (Id. ¶ 49). When Mr. Carman turned to go back into the house, he put his hands "down his front" and out of view of the officers. (Doc. 28, Def. Br. in Supp. of Def. Mot. for Partial Summ. J. at 2). Defendant then grabbed Mr. Carman by the shoulder/forearm and Mr. Carman suddenly whirled around, lost his balance and fell down two steps onto the ground. (Id.).

Both parties agree that Mrs. Carman and Ms. Vergottini were yelling at the officers and Trooper Roberts told them to back off or he would use his taser. (Pls. Facts ¶ 59; Def. Facts ¶ 10). After Mr. Carman got up, defendant explains that everyone was standing on the deck talking. (Def. Facts ¶¶ 11-12). The officers informed the plaintiffs and Ms. Vergottini that they were looking for Michael Zita. (Pls. Facts ¶ 66; Def. Facts ¶ 12). Mrs. Carman explained to Defendant Carroll that she had not seen Michael Zita for ten years and he was not on the property. (Pls. Facts ¶¶ 67-68). Plaintiffs claim defendant then told Mrs. Carman that he wanted to search their home. (Id. ¶ 69). After learning why the officers were there, defendant asserts that Mrs. Carman invited everyone inside the house. (Def. Facts ¶¶ 12, 13; Doc. 32, Pls. Reply Br. at 9).

Mrs. Carman claims that she felt compelled to give the officers permission to search their home. (Pls. Facts ¶ 70). She explained that she allowed the search because "[b]asically we weren't hiding anything. And I just wanted them to leave at that point." (Def. Facts ¶ 14). The officers searched the house with their guns drawn. (Pls. Facts ¶¶ 72-73). Michael Zita was not in the house. (Id. ¶ 74). After the search, the officers spoke with plaintiffs and Ms. Vergottini in plaintiffs' kitchen. (Id. ¶ 75). The plaintiffs were not charged with any crimes. (Id. ¶ 76).

On May 11, 2010, plaintiffs filed a complaint against Defendant Jeremy Carroll pursuant to 42 U.S.C. § 1983. (Doc. 1). Count I of the complaint alleges that defendant's conduct constituted illegal entry on to their property and into their home in violation of the Fourth and Fourteenth Amendments. (Id.) Count II of the complaint alleges that defendant's conduct, including his use of force, constituted an unreasonable seizure of Plaintiff Andrew Carman in violation of the Fourth and Fourteenth Amendments. (Id.) Defendant filed an answer on July 13, 2010. (Doc. 5).

At the close of discovery both parties moved for summary judgment. (Docs. 20, 24). Plaintiffs moved for summary judgment on all of their claims. Defendant moved for partial summary judgment on Count I of the complaint alleging illegal entry.

**Jurisdiction**

As this case is brought pursuant to 42 U.S.C. § 1983 for constitutional violations, we have jurisdiction under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

**Legal Standard**

Before the court are the plaintiffs' and defendant's motions for summary judgment. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

When considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248. A fact is material if it might affect the outcome of the suit under the governing law. Id. Where the

non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

**Discussion**

The parties filed cross-motions for summary judgment. Plaintiffs bring both counts in the complaint pursuant to 42 U.S.C. § 1983 (hereafter "Section 1983"). Section 1983 does not, by its own terms, create substantive rights. Rather, it provides remedies for deprivations of rights established elsewhere in the Constitution or federal law. Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). In pertinent part, Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Thus, to establish a claim under Section 1983, two criteria must be met. First, the conduct complained of must have been committed by a person acting under color of state law. Second, the conduct must deprive the plaintiff of rights secured under the Constitution or federal law. Sameric Corp. of Del., Inc. v. City of Phila., 142 F.3d 582,

590 (3d Cir. 1998).

In the instant case, the parties do not dispute whether the defendant acted under color of state law during the alleged violations. They only move for summary judgment as to whether there was an illegal entry and whether defendant unreasonably seized Mr. Carman with unreasonable force. We will address the two counts in the complaint, in turn.

**A. Illegal Entry**

Both parties move for summary judgment on plaintiffs' claim that defendant illegally searched plaintiffs' garage and home. Plaintiffs also argue that defendant illegally entered on to the curtilage of their property. The court will address each area of plaintiffs' property–the curtilage, the garage and the house–separately.

**1. Curtilage**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. It is well-established that the Fourth Amendment protections extend not only to a person's home, but also to the curtilage surrounding the property. United States v. Dunn, 480 U.S. 294, 301 (1987); Estate of Smith v. Marasco, 318 F.3d 497, 518 (3d Cir. 2003). "Curtilage" is defined as "the area immediately adjacent to [one's] home in which he has a legitimate expectation of privacy." United States v. Bansal, 663 F.3d 634, 663 (3d Cir. 2011) (citations omitted).

In the instant case, plaintiffs argue that they are entitled to summary judgment because defendant's entry onto the curtilage of their property violated their Fourth Amendment rights. Defendant does not dispute that the area that he and Trooper Roberts entered was "curtilage" protected under the Fourth Amendment. He contends that under the investigative

technique, “knock and talk,” the officers were allowed to knock on a resident’s door or otherwise approach the residence to speak with the inhabitants.

The Third Circuit has adopted the “knock and talk” exception to the warrant requirement. Estate of Smith, 318 F.3d at 521. This technique provides that “officers are allowed to knock on a residence’s door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may.” Id. at 519. Officers should restrict their movements to walkways, driveways, porches and places where visitors could be expected to go. Id. (quoting Wayne R. LaFave, 1 Search and Seizure: A Treatise on the Fourth Amendment § 2.3(f) (3d ed. & Supp. 2003)). Any observations made by the officers during their lawful entry under this technique do not violate the Fourth Amendment. Id. However, “[t]he flip side of this is that citizens are free not to cooperate with a ‘knock and talk’ investigation, and, absent a warrant, police cannot detain them, demand entry into their homes, or otherwise compel their cooperation unless an exception to the warrant requirement applies.” United States v. Butler, 405 F. App’x 652, 656-57 (3d Cir. 2010).

The “knock and talk” procedure is appropriate in a limited number of circumstances where the police did not observe any criminal activity before approaching the dwelling and did not know that the occupants were armed. United States v. Coles, 437 F.3d 361, 368 n.12 (quoting United States v. Jones 239 F.3d 716, 721 (3d Cir. 2001)). The “knock and talk” strategy is used when officers seek to obtain the inhabitant’s consent to search or when officers reasonably suspect criminal activity. Jones, 239 F.3d at 720; see also United States v. Claus, No. 11-1412, 2012 WL 120081, at *3 (3d

Cir. Jan. 17, 2012) (explaining that the purposes of the "knock and talk" procedure is to speak with occupants or ask for consent to search).

Some courts have extended this investigative tactic beyond the front door of the home and to other areas of the property under a limited number of circumstances. These situations often involve a failed attempt to either approach the front door because of an obstruction or a failed attempt to receive an answer at the front door. See Estate of Smith, 318 F.3d at 519 (gathering cases where courts found it was lawful for officers to move away from the front door). The Third Circuit explained,

> Where officers are pursuing a lawful objective, unconnected to any search for the fruits and instrumentalities of criminal activity, their entry into the curtilage after not receiving an answer at the front door might be reasonable as entry into the curtilage may provide the only practicable way of attempting to contact the resident . . . where the front door was inaccessible. Similarly, officers reasonably may believe, based on the facts available to them, that the person they seek to interview may be located elsewhere on property within the curtilage . . . and . . . an officer's brief entry into the curtilage to test this belief might be justified.

Id. at 520; see also United States v. Hammett, 236 F.3d 1054, 1060 (9th Cir. 2001) ("an officer may, in good faith, move away from the front door when seeking to contact the occupants of a residence.").

In the instant case, defendant contends that he was lawfully present on plaintiffs' property attempting a "knock and talk." Defendant and Trooper Roberts approached plaintiffs' residence to investigate the whereabouts of Michael Zita, an armed felon. Plaintiffs' back yard was not fenced in, and there was no indication that it was closed off from the general public. Plaintiffs assert that the defendant did not enter the

property through a route which any visitor or delivery person would use or into an area where the general public had a right to be. Defendant accessed the back yard of the property and went onto the back deck of their home.

The cases addressing lawful "knock and talk" procedures involved police officers approaching, or at least attempting to approach, the front door of a person's home. See Estate of Smith, 318 F.3d at 519. However, in adopting the "knock and talk" procedure in Estate of Smith, the Third Circuit explained that where an officer reasonably believes, based on the facts available to him, that the occupant the officer wishes to speak with may be located elsewhere on the property within the curtilage, they may enter into the curtilage to test that belief. Id. at 520. Based on defendant's observations prior to entering the curtilage and subsequent actions, we find that the there exists a question of whether the defendant's actions were reasonable in attempting a "knock and talk." We find that this question would be appropriately determined by the jury.

During defendant's deposition, he explained that he and Trooper Roberts "parked our patrol vehicles and went to the rear of the residence where we parked. We had to park at the rear because there were [sic] cars all along the side. Exited our patrol vehicles and entered the yard." (Doc. 30, Ex. D., Trooper Carroll's Tr. at 16). He could not remember if he and Trooper Roberts parked their cars on the side of the road or if there was a driveway. (Id. at 18). Defendant explained "[t]here was an open garage or shed there with some sort of light on, looked like somebody was in it. We were just going to ask them if they saw Michael Zita." (Id. at 17). They walked to the garage and defendant "just peeked in, said

Pennsylvania State Police." (Id. at 19). He did not receive a response and determined no one was there. (Id.) The troopers then turned to go towards the rear of the residence, walking through the Carmans' back yard and onto the deck.[3]

We find that in light of these circumstances, it may have been reasonable for defendant to go into plaintiffs' back yard after he thought someone might be present on the curtilage of the property, rather than going to the front door of the residence. It also may have been justified for defendant to turn from the garage and proceed to the nearest entrance of plaintiffs' residence, the back door, after the defendant looked into the garage and did not see anyone. While plaintiffs deny that the officers entered the property by a route which a visitor or delivery person would use, we simply do not know enough about the property to make such a conclusion that defendant's actions were unreasonable and thus unlawful. Therefore, we will deny plaintiffs' motion for summary judgment as to defendant's entrance onto the curtilage in violation of the Fourth Amendment.

**2. Garage**

Both parties move for summary judgment on plaintiffs' claim that defendant illegally searched plaintiffs' garage. The parties do not dispute the facts as to how defendant came on to plaintiffs' property or his observation of the inside of the garage. Defendant again relies on the "knock and talk" exception to justify his presence in plaintiffs' back yard.

---

[3] At Trooper Roberts' deposition, he recalled, "The [garage] doors were open on it and a light on. Went to the opening of the garage, looked in, I didn't see anybody in there." (Doc. 30, Ex. E, Trooper Robert's Tr. at 9).

He essentially argues that the inside of the garage was in his plain view.

A police officer may make a warrantless observation of objects in a home's curtilage within his plain view. Dunn, 480 U.S. at 304. The "plain view" exception to the warrant requirement is usually applied in situations where the police officer did not violate the Fourth Amendment in arriving at the place where evidence was viewed and the evidence was immediately apparent. See United States v. Stabile, 633 F.3d 219, 241 (3d Cir. 2011). In Minnesota v. Dickerson, the Supreme Court explained,

> Under that [plain view] doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.

508 U.S. 366, 375 (1993).

In the instant case, defendant explains that he and Trooper Roberts were legitimately on the property investigating the whereabouts of Michael Zita. He was attempting to conduct a "knock and talk" and did not violate the Fourth Amendment by observing the inside of the garage while lawfully present on the property. Defendant claims that these observations were in his plain view and therefore did not constitute a search.

Pursuant to our finding above, defendant's use of the "knock and talk" technique involves a question as to whether defendant reasonably believed, based on the facts, that a person he wished to speak with was located elsewhere on the property within the curtilage and if it was reasonable to enter the curtilage to test that belief. As the application of the plain view doctrine rests on that preceding question of whether defendant was lawfully present, we will deny the parties' motion for summary judgment as to defendant's observations of the inside of the

garage.

**3. House**

Both parties move for summary judgment on plaintiffs' claim that defendant did not obtain valid consent before searching the plaintiffs' home. Plaintiffs argue Mrs. Carman's consent was not freely or voluntarily obtained. Defendant contends Mrs. Carman invited the troopers into the house and unequivocally granted permission to search the house. Because the parties largely dispute the events and circumstances surrounding Mrs. Carman's consent, we will deny the parties' motions for summary judgment.

It is well-settled that the government may conduct a search without a warrant or probable cause if an individual consents to the search. Schneckloth v. Bustamonte, 412 U.S. 218, 227-28 (1973). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Id. at 227. In such an examination, the court should consider coercive questions and the possible vulnerable subjective state of person who consents. Id. at 229. The court must also consider the setting in which consent was obtained, including verbal and non-verbal actions. United States v. Price, 558 F.3d 270, 278 (3d Cir. 2009) (quoting United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003)). Attention should be given to the consenting individual's age, intelligence and educational background. Schneckloth, 412 U.S. at 226. Knowledge of one's right to refuse consent to search is but one factor to be taken into account and is not dispositive of the issue of valid consent. United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994).

In the instant case, the parties dispute the facts the led up to Mrs. Carman's consent to search plaintiffs' home.[4] In determining whether the consent was voluntarily, we must examine the totality of the circumstances. The setting in which Mrs. Carman granted the officers consent was after the commotion between the officers, plaintiffs and Ms. Verrgottini. Both plaintiffs and defendant cite to these portions of Mrs. Carman's testimony:

> Q. Who was it that indicated to the troopers they could go inside and search the house?
> A. I did.
> Q. Why did you allow them to do that?
> A. Basically, we weren't hiding anything. And I just wanted them to leave at that point.

(Doc. 26, Ex. A, Karen Carman Tr. at 36).

> Q. Prior to the officer going in your house to search, was everything calmed down and basically under control?
> A. I wouldn't say calmed down but I said — in my mind, if I let them go in and search for [Michael Zita] everything — like I said, would just leave. I kind of felt like I had to do that, you know, I had to let them go in or nothing was going to calm down basically.

(Id. at 47- 48).

While the parties agree to Mrs. Carman's description of how she provided consent, they disagree as to the events that occurred prior to Mrs. Carman's granting such permission. Plaintiffs claim that Mrs. Carman saw defendant push Mr. Carman up against the sliding glass door. (Pls. Facts ¶ 51). However, defendant contends that defendant went to grab Mr.

---

[4] Defendant discusses "apparent authority" to grant permission to search the premises. (Doc. 31, Def. Br. in Supp. at 7-8). However, authority to grant consent is not at issue in this case. Plaintiffs' do not dispute that Mrs. Carman had the authority, but that her consent was not freely obtained.

Carman and he ended up off of the deck and on the ground. (Def. Facts ¶ 8). Plaintiffs claim defendant was sitting on top of Mr. Carman on the ground and defendant contends he was standing next to Mr. Carman telling him to get up. (Pls. Facts ¶ 54; Def. Br. in Supp. of Partial Summ. J. at 2). The parties also somewhat dispute the nature and extent of Mr. Carman's injuries.

The parties' accounts also differ as to what prompted Mrs. Carman's consent to search. Plaintiffs argue that defendant said he wanted to search the house. (Pls. Facts ¶ 69). Defendant argues that after Mr. Carman gained control of himself and everyone was on the back deck talking, Mrs. Carman invited the troopers inside the house. (Def. Facts ¶¶ 12-13). The officers did not threaten Mrs. Carman and Mr. Carman did not object to Mrs. Carman granting the officers permission to search. Defendant also indicates that Mrs. Carman stated during her deposition that she did not remember if the officers asked her to search her house. (Doc. 26, Ex. A. Karen Carman's Tr. at 49). The parties also disagree on whether the situation had "calmed down," somehow creating a break in time from the confusion in plaintiffs' initial encounter with the officers to the plaintiffs' understanding of why the officers were at the residence.

As this court considers the totality of the circumstances to determine whether consent was freely and voluntarily given, there still exists questions of fact as to whether there was a coercive environment that would have made Mrs. Carman's consent involuntary. Therefore, we will deny the parties' motions for summary judgment.

**B. Unreasonable Seizure and Force**

Plaintiffs move for summary judgment on Count II of the complaint

alleging unreasonable seizure and unreasonable force with regard to Mr. Carman. We find that these claims involve disputed fact and summary judgment is not appropriate.

Under the Fourth Amendment, an individual is "seized" when an officer restrains a person by either means of physical force or a show of authority, thereby restraining their liberty. Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." California v. Hodari D., 499 U.S. 621, 627-28 (1991). "When a police officer has a 'reasonable, articulable suspicion that criminal activity is afoot,' he or she may conduct a 'brief, investigatory stop.'" United States v. Whitfield, 634 F.3d 741, 744 (3d Cir. 2010) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). "Reasonable suspicion" requires less than probable cause, but must rise to a minimal level of objective justification for the stop, considered under the totality of the circumstances. Id.

"The use of excessive force is itself an unlawful 'seizure' under the Fourth Amendment." Couden v. Duffy, 446 F.3d 483, 496 (3d Cir. 2006) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)). The use of excessive force during a seizure should be analyzed under the Fourth Amendment and its "reasonableness" standard. Graham, 490 U.S. at 395. Such an inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id.

The Supreme Court enumerated a number of factors to use in making an objective determination of whether the force was reasonable,

including severity of the crime, whether the suspect poses an immediate threat to the safety of the officer or others and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. Id. at 396. The Third Circuit has also articulated additional factors including, "the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997).

In the present case, the parties disagree as to the facts regarding the alleged seizure and force used by defendant on Mr. Carman. Plaintiffs claim that when Mr. Carman exited his residence he did not pose an immediate threat to the safety of the officers and was not fleeing or resisting an arrest. Plaintiffs claim that Mr. Carman answered all of defendant's questions and explained that Michael Zita was not on the property. Mr. Carman told the officers that they would need a search warrant and turned to return to his home. Defendant grabbed Mr. Carman's arm and tackled him off of the deck. After Mr. Carman was able to get up, defendant continued to ask him questions. Therefore, plaintiffs argue that Mr. Carman was not free to leave and was thus illegally seized.

To the contrary, defendant claims that when the officers went up onto the back deck to knock on the door, Mr. Carman exited the residence, was belligerent and refused to identify himself. Mr. Carman then turned around to go back to the house and he put his hands "down his front" and out of view of the officers behind him. Defendant then grabbed Mr. Carman by the shoulder and Mr. Carman whirled around, lost his balance and fell down two steps off of the deck.

Because of the disputed facts, we will deny plaintiffs' motion for summary judgment as it relates to the unreasonable seizure and unreasonable force.

**Conclusion**

For the reasons stated above, the plaintiffs' motion for summary judgment (Doc. 20) and defendant's motion for partial summary judgment (Doc. 24) will be denied. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANDREW CARMAN and KAREN CARMAN, Plaintiffs** | : | **No. 3:10cv1013** |
| | : | **(Judge Munley)** |
| **v.** | : | |
| **JEREMY CARROLL, Defendant** | : | |

## MEMORANDUM

**AND NOW**, to wit, this 29th day of March 2012, upon consideration of the parties' cross-motions for summary judgment (Docs. 20, 24), it is hereby **ORDERED** that:

- Plaintiffs' motion for summary judgment (Doc. 20) is **DENIED**; and
- Defendant's motion for partial summary judgment (Doc. 24) is **DENIED.**

**BY THE COURT:**

**s/ James M. Munley**

**JUDGE JAMES M. MUNLEY**
**United States District Court**